## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

|  |  |
|---|---|
| *In re* SANCTUARY BELIZE LITIGATION | Misc. No.:_____ |
|  | UNDERLYING ACTION PENDING AND SUBPOENAS ISSUED IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND |
|  | No.:  18-cv-3309-PJM |

## MOTION
## TO TRANSFER SUBPOENA MOTION TO ISSUING COURT OR, IN THE ALTERNATIVE, COMPEL COMPLIANCE WITH SUBPOENAS

Robb Evans and Associates LLC, as court-appointed Receiver, hereby submits this motion pursuant to Fed. R. Civ. P. 30, 37 and 45 and Local Rules 7.1 and 26.1 to (i) transfer this motion to the Issuing Court; or, in the alternative, (ii) compel Jorge Diaz-Cueto and Bella Mar Estates, LTD ("Bella Mar") to comply with the Receiver's Subpoenas to Produce Documents or Permit Inspection and the Receiver's Subpoenas to Testify at a Deposition relating to the ultimate disposition of $1.065 million in payments received by Bella Mar from a Receivership Entity (defined in the accompanying Memorandum); and (iii) to pay the attorneys' fees and costs that the Receiver has and will incur related to the failure of Mr. Diaz-Cueto and Bella Mar to fully comply with the Subpoenas.

Date:  January 22, 2020

Respectfully submitted,

/s/ Robert C. Folland
Robert C. Folland (FL Bar No. 1007951)
BARNES & THORNBURG LLP
4540 PGA Boulevard, Suite 208
Palm Beach Gardens, FL  33418
Telephone:    (614) 628-0096

Facsimile:      (614) 628-1433
Email:          rob.folland@btlaw.com


/s/ Gary Owen Caris
Gary Owen Caris, Calif. Bar No. 088918
Admitted Pro Hac Vice
Barnes & Thornburg LLP
2029 Century Park East, Suite 300
Los Angeles, CA  90067
Telephone:      (310) 284-3880
Facsimile:      (310) 284-3894
Email:          gcaris@btlaw.com

Attorneys for Receiver, Robb Evans &
Associates LLC

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| *In re* SANCTUARY BELIZE LITIGATION | Misc. No.:_____ <br><br> UNDERLYING ACTION PENDING AND SUBPOENAS ISSUED IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND <br> No.: 18-cv-3309-PJM |

### MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO TRANSFER SUBPOENA MOTION TO ISSUING COURT OR, IN THE ALTERNATIVE, COMPEL COMPLIANCE WITH SUBPOENAS

Robb Evans and Associates LLC, as court-appointed Receiver, hereby submits this memorandum in support of its Motion pursuant to Fed. R. Civ. P. 30, 37 and 45 and Local Rules 7.1 and 26.1 to (i) transfer this motion to the Issuing Court; or, in the alternative, (ii) compel Jorge Diaz-Cueto ("Diaz-Cueto") and Bella Mar Estates, LTD ("Bella Mar") to comply with the Receiver's Subpoenas to Produce Documents or Permit Inspection and the Receiver's Subpoenas to Testify at a Deposition relating to the ultimate disposition of $1.065 million in payments received by Bella Mar from a Receivership Entity (defined below); and (iii) to pay the attorneys' fees and costs that the Receiver has and will incur related to the failure of Diaz-Cueto and Bella Mar to fully comply with the Subpoenas.

## I.   INTRODUCTION AND STATEMENT OF FACTS

On October 31, 2018, the Federal Trade Commission ("FTC") filed a Complaint for Permanent Injunction and Other Equitable Relief (the "Sanctuary Belize Litigation") assigned to Senior United States District Judge Peter J. Messitte of the District Court for the District of

Maryland (the "Issuing Court"), in a case originally called *Federal Trade Commission v.*

*Ecological Fox, LLC, et al.* and now captioned *In re Sanctuary Belize Litigation*, Case No. 18-

cv-3309-PJM ("Sanctuary Belize Litigation"). The Sanctuary Belize Litigation is centered on a

large scale residential development in Belize (the "Sanctuary Belize Development") described by

the FTC as the "largest overseas real estate investment scam the FTC has ever targeted."[1]

Multiple corporate, individual and relief defendants are named, including ringleader "Andris

Pukke, a recidivist scammer ... [who] perpetuated [the scam] even while serving a prison

sentence for obstruction of justice." *Id.* In the Joint Pretrial Order filed January 10, 2020 and

approved by the Court on January 17, 2020 in the Sanctuary Belize Litigation, the FTC asserts

that Pukke, along with Peter Baker ("Baker") and Luke Chadwick ("Chadwick"), "orchestrated a

massive land scam that spanned more than a decade and victimized consumers to the tune of

$138.7 million." (Sanctuary Belize Litigation, Docs. 804 at p. 5, 832).   With the Sanctuary

Belize Litigation, "the FTC is seeking to permanently stop the scheme and obtain a court order

requiring [defendants] to turn over hundreds of millions of dollars to compensate deceived U.S.

investors." *See* FTC Press Release.  Millions of the dollars sought to be recouped on behalf of

the U.S. investors are retirement savings. *Id.* The Sanctuary Belize Litigation currently has over

830 docket entries on ECF.

    Pukke has a long history with the FTC. In a prior civil matter,  *FTC v. AmeriDebt, Inc.et*

*al.*, United States District Court, District of Maryland, 03-CV-03317 ("AmeriDebt Litigation"),

the FTC sued Pukke and his companies AmeriDebt, Inc. ("AmeriDebt"), a purported non-profit

company, which was once the largest debt counseling company in the United States, and

DebtWorks, Inc. ("DebtWorks"), its for-profit affiliate, in connection with various violations of

---

[1] https://www.ftc.gov/news-events/press-releases/2018/11/ftcs-request-court-halts-massive-sanctuary-belize-real-estate (the "FTC Press Release").

the FTC Act.  The lawsuit was commenced in November 2003.  AmeriDebt filed bankruptcy and settled with the FTC in March 2005.  The Receiver was appointed as Receiver over DebtWorks and the assets of Pukke in April 2005, at which time the Receiver was tasked with taking possession and control of all of the assets of DebtWorks and Pukke.  DebtWorks and Pukke settled with the FTC in January 2006, pursuant to a stipulated judgment for $172 million, all but $35 million of which was suspended provided, among other things, that Pukke complied with the provisions of the judgment, including provisions regarding the disclosure and turnover of all receivership property.  The judgment was entered in May 2006.

The receivership over DebtWorks and Pukke lasted from April 2005 until the Receiver was discharged over eight years later, in December 2013.  The AmeriDebt Litigation has over 800 entries on ECF and was also before Judge Messitte.   During that case, the Receiver recovered and administered assets of approximately $48 million, including a bitter and extensive battle to recover nearly $22.7 million in assets hidden by Pukke, with the help of friends, family and associates, including Baker.  Pukke's misconduct and hiding of assets in connection with the AmeriDebt Litigation resulted in his incarceration for civil contempt in 2007 and his subsequent incarceration for 15 months after pleading guilty to a charge of obstruction of justice.[2]

The Belize real estate that ultimately became the Sanctuary Belize Development ("Sanctuary Belize Property") was one of the assets subject to the Receiver's civil contempt action in the AmeriDebt Litigation.  Pukke and Baker conspired to defy the Court's order requiring them to turn over the Sanctuary Belize Property to the Receiver.  Pukke lied under oath about his ownership and control of the real estate.  When this failed, Pukke and Baker engaged in a sham transaction to attempt to insulate the Sanctuary Belize Property from the Receiver by

---

[2] In the civil contempt proceeding, Baker was also incarcerated in 2007 for his role in hiding certain assets for Pukke.

transferring it to another entity. This ploy also failed and led to Pukke's and Baker's civil contempt, among other violations of the Court's orders giving the Receiver control of Pukke's assets.

In March 2008, the Receiver released any interest in the Sanctuary Belize Property for $2.0 million pursuant to a settlement agreement with an entity called Sittee River Wildlife Reserve, believing that Pukke and Baker were no longer involved with that entity or the Sanctuary Belize Property. Unbeknownst to the Receiver, after that settlement, Pukke and Baker maintained control of the Sanctuary Belize Property. As a result of these activities, at the same time the Sanctuary Belize Litigation commenced in October 2018, the FTC filed a contempt action in the AmeriDebt Litigation against Pukke and Baker, the trial on the contempt action will be heard at the same time as trial on the Sanctuary Belize Litigation beginning January 21, 2020, and these matters have now been consolidated for hearing before Judge Messitte.

On November 5, 2018, the Issuing Court issued an Ex Parte Temporary Restraining Order With Asset Freeze, Writs *Ne Exeat*, Appointment of a Temporary Receiver, and Other Equitable Relief, and Order to Show Cause Why a Preliminary Injunction Should Not Issue ("TRO"). A copy of the TRO is attached as Exhibit A. The TRO named the Receiver as temporary receiver over substantially all of the defendants and assets related to the Sanctuary Belize Litigation (the "Receivership Entities").

The Receiver's role under the TRO was continued by the Interim Preliminary Injunction entered by the Issuing Court on November 20, 2018. The Receiver's role was made permanent pursuant to Preliminary Injunctions entered on February 9, 2019[3] and October 3, 2019.[4] A copy

_____

[3] The February 9, 2019 preliminary injunction gives the Receiver power over BG Marketing, LLC, Ecological Fox, LLC, and Foundation Partners and each of their subsidiaries, affiliates, successors and assigns.
[4] The October 3, 2019 preliminary injunction gives the Receiver power over Global Property Alliance, Inc., Sittee River Wildlife Reserve, Buy Belize, LLC, Buy International, Inc., Foundation Development Management, Inc., Eco-

of the October 3, 2019 Preliminary Injunction is attached as <u>Exhibit B</u>.[5]

In addition to managing the Sanctuary Belize Development, the Receiver is also tasked with reconstructing accounting records and preparing a forensic accounting analysis of the Receivership Entities' financial activities. The October 3, 2019 Preliminary Injunction gives the Receiver broad powers including, *inter alia,* (i) control of all of the Receivership Entities; (ii) the assumption and control of all assets of the Receivership Entities; (iii) the full authority to conduct discovery (without the need for separate litigation) pursuant to F.R.C.P 30-36 and 45; and (iv) the authority to institute any litigation related to the Receivership Entities, including, without limitation, the ability to pursue fraudulent or voidable transfers. October 3, 2019 Preliminary Injunction, Section XVI.A, D, N and Y.

The Receiver determined that $1,065,000 in payments[6] had been paid by Receivership Entity Newport Land Group ("NLG") to Bella Mar in what was purported to be some sort of purchase-money installment contract (the "Bella Mar Contract") for approximately 424 acres of land in the Bahamas (the "Bahamas Property"). In addition to being a named Receivership Entity pursuant to the October 3, 2019 Preliminary Injunction, in December 2018 the Receiver had previously deemed NLG a Receivership Entity due to, *inter alia*: (i) the transfer of $1.3

---

Futures Development, Eco-Futures Belize, Limited, Power Haus Marketing, Newport Land Group LLC, Sanctuary Belize Property Owners' Association, Prodigy Management Group LLC, Belize Real Estate Affiliates LLC, Exotic Investor LLC, and Southern Belize Realty, LLC, and each of their subsidiaries, affiliates, successors and assigns, together with 2729 Bristol LLC, 3905 Marcus, LLC, as well as any other entity that is located at, registered to, or operated from 3333 Michelson Drive, Suite 500, Irvine, California and assists, facilitates, or otherwise conducts business related to the sale of real estate in Belize; assists, facilitates, or otherwise conducts business related to the acts identified in the Findings of Fact in the Preliminary Injunction, and is owned or controlled by any Defendant; or are identified as Assets, as defined in the Preliminary Injunction, that are otherwise in the receivership and that are corporations or other legal entities. Pursuant to the Preliminary Injunction, the Receiver was also appointed as Receiver over the assets of Pukke, Baker and Chadwick valued by the Receiver at $1,000.00 or more.

[5] "It recognized that a 'court may take judicial notice of a document filed in another court 'not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.' Accordingly, a court may take notice of another court's order only for the limited purpose of recognizing the 'judicial act' that the order represents or the subject matter of the litigation." *U.S. v. Jones*, 29 F.3d 1549, 1553 (11th Circ. 1994) (internal citations omitted).

[6] Three $250,000 payments were made as a down-payment, followed by nine monthly payments of $35,000.

million of funds from Receivership Entities associated with the with Sanctuary Belize

Development to NLG; and (ii) Pukke having control over NLG, pursuant to Section XVI.W and

X of the TRO.[7]

While Bella Mar is a Bahamian entity, its president is Florida resident Jorge Diaz-Cueto.

Diaz-Cueto is a licensed Florida attorney with a law office in Miami.   When negotiating the

Bella Mar Contract for the Bahamas Property, Diaz-Cueto knew that Pukke was affiliated with

NLG.  Diaz-Cueto also was aware of at least some of Pukke's long legal history.  As noted in the

Receiver's reports filed with the Maryland District Court in the current Sanctuary Belize

Litigation, Pukke diverted over $18 million for his own personal use from funds tendered by

customers purchasing lots in the Sanctuary Belize Development.  Additionally, as noted above,

$1.3 million of funds were moved from Receivership Entities associated with the Sanctuary

Belize Development to Receivership Entity NLG. Any transfer of funds from NLG to Bella Mar

is properly subject to investigation by the Receiver.

Shortly after the Sanctuary Belize Litigation was commenced, Diaz-Cueto learned of the

FTC action from one of his contacts at NLG.  He also learned that NLG's payments might be

jeopardized due to the TRO.   Thereafter, Diaz-Cueto took steps to purportedly default NLG and

ultimately claims to have terminated the Bella Mar Contract and any right that NLG would have

to the Bahamas Property.  *See* Transcript (defined below and attached as Exhibit G) at 217:9-15.

Wanting to understand both the terms of the deal and ultimate disposition of the $1.065

million of receivership funds, the Receiver prepared two deposition subpoenas (the "Deposition

Subpoenas") and two document production requests (the "Document Subpoenas" and, together

with the Deposition Subpoenas, referred to as the "Subpoenas").  The Subpoenas named Jorge

---

[7] Those provisions of the TRO were carried forward into the October 3, 2019 Preliminary Injunction, also at Section XVI.W and X.

Diaz-Cueto, individually and also as president of Bella Mar. A copy of the Deposition

Subpoenas are attached as Exhibit C. A copy of the Document Subpoenas are attached as

Exhibit D. The Document Subpoenas explicitly request any and all documents related to the

payments received from NLG. *See* Exhibit D, Items to be Produced, ¶14. The Subpoenas were

served on August 26, 2019. Proofs of service are attached as Exhibit E. Diaz-Cueto provided a

written document entitled OBJECTIONS AND RESPONSES TO REQUEST FOR

PRODUCTION ("Responses") on September 20, 2019, a copy of which is attached as Exhibit

F.[8] Diaz-Cueto did not move for a protective order or to quash the Subpoenas. Diaz-Cueto sat

for a deposition on December 4, 2019. Pertinent sections of the deposition transcript, delivered

to the Receiver on December 19, 2019 are attached as Exhibit G. Diaz-Cueto's attorney was

unavailable from December 15, 2019 until January 6, 2020. *See* Exhibit H. Upon her return,

Receiver's counsel attempted to meet and confer with her and on January 8, 2020 (attached as

Exhibit I) sent correspondence attempting to resolve the open issues pertaining to the Deposition

Subpoenas. On January 8, 2020, the Receiver's counsel received correspondence from Diaz-

Cueto's attorney indicating (i) he would not be responding to the Subpoenas regarding the

$1.065 million and (ii) there would be no further discussion on the point.[9] A copy of this

correspondence is attached as Exhibit J[10].

---

[8] Though the Responses state that they come from Ecological Fox, the Responses are actually from Diaz-Cueto and Bella Mar. Additionally, though it lists "OBJECTIONS" in its title, there are actually no written objections to the Document Subpoenas in the Responses. 83 pages of documents were produced.

[9] Other outstanding documents not related to the $1.065 million will be produced, according to Diaz-Cueto's counsel. The Receiver is not moving to compel the production of those documents at this time, but reserves the right to do so should the promised production not be forthcoming.

[10] The Receiver has brought this Motion outside of the 30-day window referenced in Local Rule 26.1(g)(1). To the extent this rule applies to this Motion, the Receiver submits that good cause exists to hear this Motion since (1) opposing counsel was unavailable until January 6, 2020 and it was not until January 8, 2020 that the Receiver's counsel understood that attempts to meet and confer on this point would be unsuccessful. See *ADP, LLC v. Ultimate Software Group, Inc.*, 2017 WL 7794306, *1 (S.D.Fla. 2017) (30-day period tolled while parties attempted out-of-court resolution).

7

This Motion seeks to compel Diaz-Cueto to provide documents and answer deposition questions pertaining to the ultimate disposition of the $1.065 million.   For the reasons set forth below, the Receiver submits that (i) this Court should transfer resolution of this Motion to the Issuing Court for decision; or, in the alternative, that this Court should order Diaz-Cueto and Bella Mar to (ii) provide documents and answer the Receiver's deposition questions regarding the $1.065 million in payments; and (iii) to pay the attorneys' fees the Receiver has incurred and will incur as a direct result of the failure of Diaz-Cueto and Bella Mar to fully comply with the Subpoenas.

## II.   THE RECEIVER REQUESTS THAT THIS COURT TRANSFER RESOLUTION OF THIS MOTION TO THE ISSUING COURT

Typically, a subpoena-related motion will be heard by the compliance court, not the issuing court.  Fed. R. Civ. P. 37(a)(2), 45(c) and (d)(2)(B)(i); *Morrissey v. Subaru of America, Inc.*, 2015 WL 9583278, at *2-3 (S.D. Fla. 2015).  But, the Rules authorize the transfer of subpoena-related motions from the court where production is required (the "Compliance Court") to the court where the underlying action is pending (the "Issuing Court") if the "person subject to the subpoena consents or if the court finds exceptional circumstances." Fed. R. Civ. P. 45(f). The term "exceptional circumstances" is not defined in Rule 45(f).  However, the Advisory Committee's Note provides guidance on the application of the rule:

> In the absence of consent, the court may transfer in exceptional circumstances, and the proponent of transfer bears the burden of showing that such circumstances are present. The prime concern should be avoiding burdens on local nonparties subject to subpoenas, and it should not be assumed that the issuing court is in a superior position to resolve subpoena-related motions. In some circumstances, however, transfer may be warranted in order to avoid disrupting the issuing court's management of the underlying litigation, as when that court has already ruled on issues presented by the motion or the same issues are likely to arise in discovery in many districts. Transfer is appropriate only if such interests outweigh

8

the interests of the nonparty served with the subpoena in obtaining local resolution of the motion. Judges in compliance districts may find it helpful to consult with the judge in the issuing court presiding over the underlying case while addressing subpoena-related motions.

Fed. R. Civ. P. 45(f) advisory committee's note (2013 amendments).  In determining whether "exceptional circumstances" exist, courts consider several factors, including the "complexity, procedural posture, duration of pendency, and the nature of the issues pending before, or already resolved by, the issuing court in the underlying litigation." *Judicial Watch, Inc. v. Valle Del Sol, Inc.*, 307 F.R.D. 30, 34 (D.D.C. 2014).  The duration of the Sanctuary Belize Litigation, combined with its complex history, weighs in favor of finding exceptional circumstances.  The PACER docket entries for the Sanctuary Belize Litigation exceed 830 entries.  Currently reactivated after several years of dormancy, the AmeriDebt Litigation was commenced 17 years ago and involves Pukke, Baker and the same real estate that later became the Sanctuary Belize Property.  There are over 1600 PACER docket entries between the AmeriDebt Litigation and the Sanctuary Belize Litigation.  When considering a case that had lasted 10 years and had over 1000 PACER docket entries, a District Court in this District transferred a subpoena-motion to the Issuing Court.  *Dispatch Printing Company v. Zuckerman*, 2016 WL 335753 (S.D. FL 2016). In *Zuckerman*, the Court noted that "the persuasive evidence of the complexity and length of the underlying litigation" lent "weight to the presence of exceptional circumstances." *Id.* at *3.  *See also Wultz v. Bank of China, Ltd.*, 304 F.R.D. 38, 46 n. 6 (D.D.C. May 30, 2014) (transferring subpoena-related motions in "highly complex" litigation where issuing court "is in better position to rule...due to her familiarity with the full scope of issues involved as well as any implications the resolution of the motion will have on the underlying litigation" and to further "the interest in obtaining consistent rulings on the issues presented"); *In re UBS Fin. Servs., Inc.*

9

*of Puerto Rico Sec. Litig.*, 113 F.Supp.3d 286, 288 (D.D.C.2015) (finding exceptional circumstances where the "case had been pending in the [issuing court] for almost three and a half years, and [the issuing court] ha[d] issued a multitude of orders resolving significant procedural and discovery disputes during that time"). Thus, the Receiver submits that this Motion should be transferred to the Issuing Court for ruling.

## III.   THE COURT SHOULD ORDER COMPLIANCE WITH THE DEPOSITION QUESTIONS AND DOCUMENT PRODUCTION RELATED TO THE $1.065 MILLION IN PAYMENTS

In the alternative, should this Court decline to transfer this matter, this Court should order Diaz-Cueto and Bella Mar to comply with the Subpoenas and answer the deposition questions and produce the documents related to the $1.065 million in payments. Fed. R. Civ. P. 37(a)(3)(B)(i) allows the Receiver to seek an order compelling the Deponents to answer the Receiver's deposition questions pertaining to the $1.065 million in payments.[11] Likewise, Fed. R. Civ. P. 45(d)(2)(B)(i) allows the Receiver to seek an order compelling production of any documents related to the $1.065 million in payments.

Pursuant to Local Rule 26.1(g)(2), the Receiver states (A) verbatim the specific items to be compelled, (B) the specific objections; (C) the grounds assigned for the objection (if not apparent from the objection); and (D) the reasons assigned as supporting the motion as it relates to that specific item. The Receiver seeks to compel Diaz-Cueto, on his behalf and on behalf of Bella Mar, to answer the Receiver's deposition questions and provide documents regarding disposition of the $1.065 million in payments from NLG. There were multiple requests asked regarding this money and the questions that Diaz-Cueto refused to answer include:

- General disposition of the $1.065 million. *See* Transcript 242:1-25; 256:8-

---

[11] While being deposed, Diaz-Cueto would often veer between a flat out refusal to answer the questions to providing "I don't know" responses which qualifies as a non-response pursuant to Fed. R. Civ. P. 37(a)(4).

19.

- Disposition of the $750,000 down payment made by NLG. *See* Transcript 234:12-22.

- How much of the $1.065 million was received by Diaz-Cueto. *See* Transcript 239:23 to 242:4; 243:6-18.

- How much of the $1.065 million was received by Bella Mar owner or beneficial owner Arnold Johnson. *See* Transcript 243:20-23.

- How much of the $1.065 million was received by Bella Mar owner Merlean Poitier. *See* Transcript 246:2-9.

- How much of the $1.065 million was received by Bella Mar owner Tootsie Hunter. *See* Transcript 248:16-23.

- Production of documents related to the $1.065 million. *See* Transcript, 256:8-19.

In the deposition, Diaz-Cueto acknowledged that Bella Mar received the $1.065 million in payments from NLG. But he testified that Bella Mar no longer has the $1.065 million. *See* Transcript at 239:9-12. He refused to answer the Receiver's questions about where the $1.065 million went. Diaz-Cueto[12] made four objections when refusing to answer these questions or provide the related documents, making multiple references to "certifying" this issue before the court. *See* Transcript 230:2-8; 241:18-25; 242:1-4, 16-20; 243:6-18; 246:2-9 and 248:16-23. First, Diaz-Cueto argued that to provide the answer would violate attorney-client privilege. *See* Transcript 234:12-22; 247:4-25. Second, Diaz-Cueto argued he was not authorized by the shareholders in Bella Mar to divulge where the $1.065 million went. *See* Transcript 230:2-8; 233:18-21; 234:12-22;

---

[12] Mr. Diaz-Cueto had counsel, Patricia Cassells, who appeared on his behalf at the deposition. However, it was largely Mr. Diaz-Cueto who made the objections to the Receiver's questions.

242:1-25.   Third, Diaz-Cueto argued inquiry regarding the $1.065 was not relevant. *See* Transcript 241:18 to 242:4; 242:1-25.   Finally, Diaz-Cueto argued that no response was necessary since the deposition was not "in aid of execution."[13] *See* Transcript 229:7-9, 13-17

A party who wishes to object to a question must do so concisely, and the deponent must, in most instances, still answer the question. *Breaux v. Haliburton Energy Servs.*, 2006 WL 2460748, *4 (E.D. La. 2006) ("[O]nce the objection is made, the witness answers the question and the parties move on."). The only exceptions are those stated in the last sentence of Rule 30(c)(2) which allows a deponent to refuse to answer a deposition question to preserve a privilege, enforce a limitation ordered by the court, or to present a motion to terminate or limit the deposition under Rule 30(d)(3). Likewise, any objection to a subpoena's request for production must be made by the earlier of the time for compliance or 14 days. Fed. R. Civ. P. 45(d)(2)(B). Failure to serve written objections (or failure to file a motion to quash) typically results in a waiver of such objections. *Center for Individual Rights v. Chevaldina*, 2017 WL 5905191, *4 (S.D.Fla. 2017).

Diaz-Cueto's objection based on attorney client privilege should be overruled.  As a threshold matter, Diaz-Cueto did not file a motion under Rule 30(d)(3), a motion to quash or a motion for protective order.  His written Responses to the document production contained no objection based on this privilege.  In fact, his written Responses contained no objections whatsoever.  More importantly, Diaz-Cueto was subpoenaed personally, and as the president of Bella Mar, not as its attorney.   Diaz-Cueto did not act as attorney for Bella Mar as relates to the Bella Mar Contract.  Bella Mar had Bahamian counsel for the deal.  Diaz-Cueto never asserted at any other point in the deposition that testimony provided regarding the Bella Mar Contract was

---

[13] By this, the Receiver presumes that Diaz-Cueto is arguing that the Receiver's discovery rights are limited since there is no judgment in favor of the Receiver and against Diaz-Cueto or Bella Mar.

subject to the attorney-client privilege.  The Receiver is not seeking any information that would intrude upon the attorney-client privilege. The Receiver merely seeks facts regarding the disposition of the $1.065 million that Diaz-Cueto and Bella Mar admit receiving from NLG.  The attorney client privilege does not prevent the discovery of facts, only communications between a lawyer and his client for the purpose of obtaining legal advice. *Henderson v. Holiday CVS, L.L.C.,* 269 F.R.D. 682, 687 (S.D.Fla. 2010).  Similarly, the work-product doctrine merely protects evidence or testimony that contains "the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation." Fed. R. Civ. P. 26(b)(3)(B).  Here, the Receiver is not asking about legal communications or work product related to litigation, only about the facts pertaining to the disposition of the $1.065 million. Further, even if the privilege were somehow to apply, Diaz-Cueto had been answering deposition questions for several hours before raising this objection and even went as far as partially answering questions about how much money he had received from the $1.065 million before raising the attorney-client privilege  Therefore, the privilege is waived. *Henderson v. Holiday CVS, L.L.C.,* 269 F.R.D. 682, 687 (S.D.Fla. 2010)(noting "voluntary disclosure of the facts in question constitutes a waiver of the privilege"). Diaz-Cueto must be compelled to answer the deposition questions and provide the related documents.

Diaz-Cueto also refused to answer the questions or provide documents on the basis that the Bella Mar shareholders had not authorized to him to provide this information. There is no requirement in the Rules that the consent of a business entity's ownership is required to respond to a subpoena. *See. e.g. Ashe v. Distribuidora Norma Inc.*, 965 F.Supp.2d 212 (D. P.R. 2013)(finding that witness could not refuse to testify at deposition action because he had confidentiality agreement with the employer).  Further, the people he referred to as shareholders

13

– Merlean Poitier and Tootsie Hunter – work as a legal assistant and in the accounting

department in Bella Mar's Bahamian lawyer's office. *See* Transcript 14:11-13; 16:18-25; 17:9-

15. Given that Diaz-Cueto is Bella Mar's President, it appears the shareholders of Bella Mar are

straw persons for the real ownership.[14]

Finally, Diaz-Cueto objected to the Receiver's discovery on the basis of relevance and,

more specifically, that the requested information was not relevant since the deposition was "not

in aid of execution." Information requested via discovery is subject to discovery if it appears

reasonably calculated to lead to the discovery of admissible evidence. *See* Fed.R.Civ.P. 26(b)(1);

*Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 350, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978).

Discovery should ordinarily be allowed unless it is clear that the information sought has no

possible bearing on the claims and defenses of the parties or otherwise on the subject matter of

the action. *Dunkin' Donuts, Inc. v. Mary's Donuts, Inc.,* 2001 WL 34079319, at *2 (S.D.Fla.

2001). Here, the deposition questions and document request pertaining to Diaz-Cueto and Bella

Mar's receipt of $1.065 million from NLG are permissible in light of the Receiver's role in the

Sanctuary Belize Litigation for several reasons. The Receiver is tasked with control of all

Receivership Entities, including NLG, and their assets (*see* October 3 Preliminary Injunction at

XVI.A and B) and, in that role, is conducting a forensic accounting of the Receivership Entities'

financial dealings, transactions and monetary transfers. The Receiver is also empowered to

conduct discovery pursuant to Section XVI.Y of the October 3, 2019 Preliminary Injunction and

to pursue litigation on the Receivership Entities' behalf (*Id.* at XVI.N). Without limiting any

possible claim, the Receiver asserts that breach of contract, rescission and/or fraudulent transfer

claims potentially lie against Bella Mar and the transferees of the $1.065 million paid by NLG to

---

[14] Diaz-Cueto testified that he, Arnold Johnson and Augustine Novo (also Florida residents) all held "undetermined beneficial interests" in Bella Mar. *See* Transcript 13:14-22; 19:25 to 20:13.

Bella Mar but this discovery is needed to assess these potential litigation claims. Diaz-Cueto testified that there were two shareholders and, including himself, three people who held "undetermined beneficial interests" in Bella Mar.  Because the October 3, 2019 Preliminary Injunction already gives full power to the Receiver to pursue discovery without the need to commence new litigation, it is prudent and economical for the Receiver to  determine  who received some portion of the $1.065 million before commencing any litigation.

## IV.   ATTORNEYS' FEES

"Rule 37(a)(5) provides for payment of expenses, including attorney's fees, when a court grants a motion to compel discovery. Fed.R.Civ.P. 37(a)(5). The payment of the moving party's expenses is required unless 'the opposing party's nondisclosure, response or objection was substantially justified' or 'other circumstances make an award of expenses unjust.' *Id.* at 37(a) (5)(A)(ii) and (iii). A court has wide latitude in imposing sanctions for failure to comply with discovery." *Alhassid v. Bank of America,* 2015 WL 1120273, *3 (S.D.Fla. 2015) (citing *Maryland Cas. Co. v. Shreejee Ni Pedhi's, Inc.,* 2013 WL 3353319, *4 (M.D.Fla. 2013)). Here, the Receiver requests that it be awarded its fees and costs, including travel expenses, in (i) preparing and arguing this motion; and (ii) conducting any subsequent discovery as compelled by this Court.

## V.   CONCLUSION

Based on the Motion, this Memorandum of Points and Authorities, along with the exhibits attached thereto, and supporting Declaration of Gary Owen Caris, it is respectfully requested that the Court grant the Motion by (i) transferring the Motion to the Issuing Court for ruling; or (ii) compelling Mr. Jorge Diaz-Cueto to respond to the Subpoenas and answer the deposition questions and produce the documents related to the $1.065 million in payments and to

pay the attorneys' fees and costs, including travel expenses, in (i) preparing and arguing this motion; and (ii) conducting any subsequent discovery as compelled by this Court.

## CERTIFICATE OF GOOD FAITH CONFERENCE; CONFERRED BUT UNABLE TO RESOLVE ISSUES PRESENTED IN THE MOTION

Pursuant to Local Rule 7.1(a)(3)(A), I hereby certify that counsel for the movant has conferred with all parties or non-parties who may be affected by the relief sought in this motion in a good faith effort to resolve the issues but has been unable to resolve the issues.

Dated:  January 22, 2020

Respectfully submitted,

*/s/ Robert C. Folland*
Robert C. Folland (FL Bar No. 1007951)
BARNES & THORNBURG LLP
4540 PGA Boulevard, Suite 208
Palm Beach Gardens, FL  33418
Telephone:     (614) 628-0096
Facsimile      (614) 628-1433
Email:         rob.folland@btlaw.com

*and*

*/s/ Gary Owen Caris*
Gary Owen Caris, Calif. Bar No. 088918
*Admitted Pro Hace Vice*
BARNES & THORNBURG LLP
2029 Century Park East, Suite 300
Los Angeles, CA  90067
Telephone:     (310) 284-2880
Facsimile      (310) 284-3894
Email:         gcaris@btlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by first class mail on January 22, 2020 on all counsel or parties of record on the service list below:

_____

Robert C. Folland

SERVICE LIST

Patricia Cassells
PATRICIA CASSELLS & ASSOCIATES
20210 SW 92nd Ave,
Miami, FL 33189;
223 E. Flagler Street, Suite 502
Miami, FL 33131
Telephone: 786-226-3329
*Counsel for Jorge Diaz-Cueto*